UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| SHEILA SISK | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:09-CV-220 |
| v. | ) | |
| | ) | *Collier / Lee* |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This action was brought by Plaintiff Sheila Sisk pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying Plaintiff disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). Plaintiff seeks the award of benefits, or in the alternative, a remand to the Commissioner. Plaintiff has moved for judgment on the pleadings [Doc. 13] and Defendant has moved for summary judgment [Doc. 18]. Because the Commissioner erred in disregarding the opinion of Plaintiff's treating physician, I **RECOMMEND** that: (1) Plaintiff's motion for judgment on the pleadings [Doc.13] be **GRANTED**; (2) Defendant's motion for summary judgment [Doc. 18] be **DENIED**; (3) the decision of Commissioner be **REVERSED**; and (4) this action be **REMANDED**.

## I.     ADMINISTRATIVE PROCEEDINGS

Plaintiff filed her applications for DIB and SSI benefits on November 21, 2006, alleging disability since May 19, 2006 (Tr. 90, 98). She complained of blackouts and nerves (Tr. 107), and the SSA also found she suffered from back pain, depression, and migraines (Tr. 70). Plaintiff described severe headaches of varying frequency which caused nausea, and she stated she took a

prescribed medication, Imitrex, which caused her to sleep for up to 12 hours (Tr. 17, 29). She also

complained of left shoulder pain (Tr. 135). Her applications were denied on February 13, 2007 and

then upon reconsideration on April 9, 2007 (Tr. 71, 78, 80). Plaintiff retained an attorney after the

first unfavorable decision and has been represented by counsel since February 23, 2007 (Tr. 76, 88).

She requested and was granted a hearing before an Administrative Law Judge ("ALJ") (Tr. 46, 82).

The hearing took place on December 9, 2008 before ALJ John Maclean, who concluded Plaintiff

was not disabled (Tr. 22). On April 27, 2009, Plaintiff requested review of the ALJ's decision (Tr.

6-7), and the Appeals Council denied her request on July 9, 2009, making the ALJ's decision the

final, reviewable decision of the Commissioner (Tr. 1).

## II.    ELIGIBILITY FOR DISABILITY BENEFITS

The Social Security Administration ("SSA") determines eligibility for disability benefits by

following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v).

> 1) If the claimant is doing substantial gainful activity, the claimant is
> not disabled.
>
> 2) If the claimant does not have a severe medically determinable
> physical or mental impairment-i.e., an impairment that significantly
> limits his or her physical or mental ability to do basic work
> activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one
> of the listings in Appendix 1 to Subpart P of the regulations and
> meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from
> doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant
> is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). Between steps three and four, the

ALJ determines the claimant's residual functional capacity ("RFC"). *Id.* The claimant bears the burden of proof at the first four steps, but the burden shifts to the Commissioner at step five to show there are jobs the claimant can perform. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

## III.    FACTUAL BACKGROUND AND ALJ'S FINDINGS

Born in 1961, Plaintiff was 44 years old at her alleged onset (Tr. 90). She is a high school graduate and has work experience as a bakery clerk (2004-2005), hand packer (2003-2004), and shift leader/textile winder (1979-2002) (Tr. 111, 117).

### A.    Plaintiff's Complaints and Treatment History

#### 1.    Headaches

On May 17, 2006, two days before her alleged onset date, Plaintiff saw Dr. Nicholas Salt, M.D., her treating physician, and complained of migraines that had lasted for the past three days (Tr. 356). These pains were left-sided and she rated them a seven on a ten-point scale (*id.*). After diagnosing migraine headache, Dr. Salt prescribed Toradol and Phenergan and gave her a note for work for May 15 through May 17 (*id.*). On March 26, 2007, Plaintiff returned to Dr. Salt with ongoing problems with migraine headaches, noting they occurred one to two times a month and lasted two to three days (Tr. 335). Plaintiff reported headaches, vomiting, and fever/chills on November 1, 2007, and Dr. Salt again prescribed Phenergan and Toradol (Tr. 321). At a November 12, 2007 appointment, Plaintiff stated her headache was "better" (Tr. 320), but in December, 2007, she stated she had been having a "lot" of headaches over the past month (Tr. 319). Dr. Salt again diagnosed migraine headaches and prescribed Imitrex for the pain (*id.*).

Plaintiff continued to see Dr. Salt for headache treatment in 2008. On January 14, she reported continued headaches with nausea and vomiting (Tr. 318), and on February 28, she stated her headaches occur "most days" (Tr. 317). Plaintiff again complained of headaches in May 2008 (Tr. 519). On July 17, she had a slight headache when she visited Dr. Salt's office, and he diagnosed intermittent headaches (Tr. 518). Dr. Salt also diagnosed migraine headaches at Plaintiff's October 2008 visit (Tr. 516). In December 2008, Plaintiff stated she had a headache the previous week with pain originating behind the eyes, and this headache was accompanied by nausea and vomiting (Tr. 515). Again in March 2009, Plaintiff reported migraine headaches (Tr. 528), and on April 16, 2009, she stated she had "a lot of migraines lately" with headaches occurring daily (Tr. 526).

At the hearing, Plaintiff testified a headache "just strictly puts [her] in the bed" and noted light and noise make her headaches worse (Tr. 31-32). She stated the headaches occur three to four times a month and are increasing, partly because of stress caused by family issues (Tr. 31). She testified that after taking her migraine headaches medication, she would be incapacitated for up to 12 hours (Tr. 31-32).

## 2.    Blackouts

Plaintiff visited Dr. Salt on October 9, 2006 and reported blackout spells during which everything "goes dark" but without actually falling (Tr. 349). On November 16, however, Plaintiff informed Dr. Salt of a blackout spell where she fell and hurt her left arm (Tr. 343). Dr. Salt recommended, among other tests, a CT scan, the results of which were "unremarkable" (Tr. 226, 343). Plaintiff returned to Dr. Salt's office on December 21, 2006 and reported ongoing intermittent blackout spells, with the most recent one occurring one month previous (Tr. 341). The following month, Dr. Salt noted Plaintiff still had intermittent blackouts but could no longer afford further

investigation into that condition (Tr. 340). The MRI of Plaintiff's brain dated January 18, 2007 was mostly unremarkable, but showed one abnormality (a "small focal area of mucosal thickening posterior left ethmoid sinus") which had not changed since the prior CT scan, indicating either "chronic disease or possibly a small irregular mucous retention cyst" (Tr. 232). Plaintiff described symptoms of pre-syncope when she went to Dr. Salt's office on March 26, 2007 (Tr. 335), and Plaintiff later reported a syncope episode that took place on November 11, 2007 (Tr. 320). On July 17, 2008, however, she informed Dr. Salt there had been no syncope episodes in the last six months (Tr. 518).

At the hearing, Plaintiff stated she was having blackout spells at a frequency of one every two or three months (Tr. 36). She stated they began in 2006 when she was knocked down twice by equipment at work, but she acknowledged that her doctors had been unable to find anything wrong (Tr. 26-27). She stated that during these spells she could not see or hear anything and that afterward she had to sit down for a while before returning to work (*id.*). She testified that "everything goes black" and that she sees "little white spots" whenever an episode occurs (Tr. 36). Plaintiff testified she injured herself once during a spell by falling off her front porch and she now tries to sit down by a wall whenever she thinks she might blackout (*id.*). She also maintained she has had no blackouts while driving, but drives only infrequently (Tr. 36).

### 3. Neck and Shoulder Pain

Plaintiff reported on November 16, 2006, that she hurt her left arm after falling during a blackout spell, and Dr. Salt's examination indicated left shoulder abduction limited to 90 degrees with pain and tenderness (Tr. 343). Dr. Salt recommended x-rays of Plaintiff's left shoulder (*id.*) Dr. Salt examined Plaintiff's left shoulder again on January 11, 2007, and noted full range of motion,

but with discomfort (Tr. 340). When she returned in February, Plaintiff complained of continued

back pain and some left-sided neck discomfort, and Dr. Salt diagnosed osteoarthritis of the cervical

spine (Tr. 339). Later the same month, Plaintiff told Dr. Salt that Celebrex did not help her neck

pain, and Dr. Salt found her range of motion limited in her neck turning to the left and right and in

lateral flexion (Tr. 338).

X-rays taken on March 14, 2007 showed cervical spondylolisthesis in the C6-7 disc (Tr.

234). On March 30, 2007, an MRI confirmed "severe disc disease at C6-7," with abnormalities

resulting in "mild to moderate spinal stnenosis" (Tr. 236). On April 4, 2007, she complained of pain

in her left trapezius area and shoulder, and Dr. Salt's assessment showed pain with range of motion

in the cervical spine (Tr. 334).

Dr. Salt referred Plaintiff to Dr. Jay Jolley, M.D., an orthopedic surgeon, who performed a

C6-7 anterior cervical discectomy and fusion in May 2007 and recommended an injection for

Plaintiff's left shoulder (Tr. 242, 333-34). In Dr. Jolley's July 2007 follow-up report, Plaintiff

complained of left shoulder pain and rated her pain as a four on a ten-point scale, though she stated

her Lortab prescription was effective in controlling the pain (Tr. 242). Plaintiff reported her pain

was intensified by lifting and diminished by pain medication, but she also stated she felt a "95%

overall improvement since her surgery" (*id.*). In his assessment, Dr. Jolley diagnosed left shoulder

impingement and tendonitis and noted she was doing well since her surgery (*id.*). Dr. Jolley noted

Plaintiff should receive treatment for shoulder pain "as needed," and recommended she resume

activity "as tolerated" (Tr. 243). On December 20, 2007, Plaintiff reported to Dr. Salt some soreness

in her left shoulder, and Dr. Salt noted she had a limited range of motion (Tr. 319).

In July 2008, an examination again showed that Plaintiff had some pain in her left shoulder

when she moved it, and Dr. Salt recommended an MRI of the left shoulder (Tr. 518) which showed cysts adjacent to the superior margin of the supraspinatus tendon and probable minimal partial thickness tear in the lateral, posterior supraspinatus tendon (Tr. 522). Plaintiff complained of neck discomfort on April 16, 2009, and Dr. Salt noted her neck was supple, but there was some tenderness over the cervical spine (Tr. 526).

Plaintiff testified that Dr. Jolley had released her but had also told her that she did have some problems with her left shoulder (Tr. 30). She described the pain as going all the way across her left shoulder and into the side of her neck, and she commented that the pain was starting to affect her right side (Tr. 32). She stated she had not pursued treatment for the shoulder lately due to a lack of financial resources and because she was having so many headaches (*id.*). At the hearing, Plaintiff was moving around in the chair, and the ALJ asked her whether the posture change was to relieve the pain (*id.*). Plaintiff answered affirmatively and stated she could sit for 15 to 30 minutes before having to change position, but then she had to stand after sitting for two hours (Tr. 32-33). She testified that she has to lie down for around two hours a day because of the pain caused by her shoulder and back (Tr. 33).

### B.    Medical Opinions

#### 1.    Nicholas Salt, M.D. – Treating Physician

Dr. Salt has been Plaintiff's treating physician since January 1997 (Tr. 485, 504) and has seen her consistently, sometimes even twice a month, since the date of her alleged onset (Tr. 317-543). He stated that Plaintiff is not a malingerer (Tr. 510). Dr. Salt completed a Multiple Impairment Questionnaire on March 26, 2007, in which he diagnosed migraine headaches, pre-

syncope, chronic low back pain and left shoulder pain, and anxiety/depression[1] (Tr. 504-11). He described Plaintiff's prognosis as "stable" (Tr. 504). Dr. Salt noted Plaintiff had full range of motion in her left shoulder but with discomfort at the extremes (*id.*). Dr. Salt described Plaintiff's shoulder pain as "achy" and "almost constant," triggered by activity with her left arm (Tr. 505-06). He rated Plaintiff's pain as moderate--four on a ten-point scale (Tr. 506). Dr. Salt noted that the pain was relieved by hydrocodone and he answered affirmatively in response to the question, "Have you been able to completely relieve the pain with medication without unacceptable side effects?" (Tr. 506). Plaintiff was also taking Paxil and Klonopin, but she reported no side effects from these medications to Dr. Salt (Tr. 508).

Dr. Salt opined Plaintiff could sit for four hours during a competitive eight-hour day, but only if she were able to get up every one to two hours (Tr. 506). He opined she could stand/walk for two hours during an eight-hour day (*id.*). According to Dr. Salt, Plaintiff could lift or carry up to five pounds occasionally but could lift no amount of weight frequently (Tr. 507). Plaintiff was essentially precluded from using her left arm to grasp, turn, or twist objects or for reaching, but her right arm was no more than minimally limited in any category of activity (Tr. 507-08). Dr. Salt opined Plaintiff's symptoms were likely to increase if she were placed in competitive work environment, but he stated she would be able to do a full time competitive job requiring activity on a sustained basis as long as she was able to take breaks (Tr. 508-09). He qualified this by noting Plaintiff's breaks would be unscheduled and might occur at unpredictable intervals (Tr. 509). Dr. Salt also noted anxiety and intermittent depression contributed to the severity of Plaintiff's symptoms and functional limitations and stated she was incapable of low stress and was even

_____

[1]Plaintiff concedes her depression and back pain are *de minimis* (Pl. Reply at 1-2).

stressed at home (*id.*). Dr. Salt opined Plaintiff would likely miss work more than three times a month (Tr. 510).

In a Headaches Impairment Questionnaire completed on March 18, 2008, Dr. Salt diagnosed tension headaches and occasional migraine headaches (Tr. 498-503). He stated that Plaintiff's headaches originated behind the eyes and in the bitemporal area, and he described them as "severely intense" with nausea/vomiting at times and photosensitivity (Tr. 499). Plaintiff's tension headaches were triggered by stress; they occurred daily and could last from a half a day up to a full day (*id.*). Bright lights, stress, noise, and moving around could all make Plaintiff's pain worse, and the headaches were severe enough to interfere with her concentration and attention "constantly" (Tr. 500-01). Plaintiff's migraines occurred only about once per month (Tr. 500). He instructed her to take medication when she was suffering from a headache (Tr. 500), and he stated he had been able to completely relieve the pain without unacceptable side effects (Tr. 501). Nonetheless, Dr. Salt concluded Plaintiff would miss work more than three times a month due to her impairments or treatment, but he also noted that, during a headache, she would not be precluded from doing basic work activities and would not have to take a break from the workplace (Tr. 502).

### 2.    Emelito Pinga, M.D. - SSA Consultative Examiner

Emelito Pinga, M.D., examined Plaintiff for the SSA on January 9, 2007 (Tr. 203-08). He noted that she gave "good effort" and was a reliable historian (Tr. 205). The results of the examination were essentially normal (Tr. 206-07). Dr. Pinga diagnosed syncope with fainting spells by history and noted Plaintiff might need to see a neurologist for this condition (Tr. 207). He also diagnosed degenerative arthritis of the lumbar spine and suggested Plaintiff might need an MRI of the lumbar spine to rule out any underlying degenerative disc disease (Tr. 207-08). Dr. Pinga opined

Plaintiff could sit for six hours and walk or stand for four hours during an eight-hour competitive workday (Tr. 208). He also opined she would be able to lift five to ten pounds frequently and 15 pounds occasionally (*id.*).

### 3. Robert Culpepper, M.D. - Reviewing Consultant

Robert Culpepper, M.D., a non-examining consultant, offered a brief "medical consultant review" in February 2007, in which he opined Plaintiff suffered from no significant functional restrictions (Tr. 209).

### 4. Carol Phillips, Ph.D. - SSA Consultative Examiner

Carol Phillips, Ph.D., a licensed psychologist, evaluated Plaintiff at the request of the SSA in December 2006 (Tr. 180-83). Dr. Phillips noted that, during the interview, Plaintiff sat "easily" in the chair and exhibited no difficulties in gait or posture (Tr. 180). Plaintiff complained of difficulties with anxiety and described minimal daily activities: occasional sweeping or cooking with the microwave and watching television (Tr. 180-81). Dr. Phillips diagnosed depressive disorder (Tr. 182). Dr. Phillips opined Plaintiff was able to understand and recall short, simple work functions but was mildly impaired in understanding and carrying out detailed instructions (*id.*). Concentration and persistence were mildly to moderately impaired, as was her ability to adapt to changes and requirements in work settings (*id.*). Plaintiff's ability to interact appropriately with others was unimpaired (*id.*).

### 5. Rebecca Joslin, Ed.D. - Reviewing Consultant

Rebecca Joslin, Ed.D., a non-examining consultant, offered a mental RFC assessment in January, 2007 (Tr. 185-202). She opined that Plaintiff was mildly limited with respect to activities of daily living, an opinion based on the observation that Plaintiff lived alone and performed chores

and was limited in her activities mostly by her physical impairments (Tr. 199, 201). Plaintiff was also mildly limited in social functioning, moderately limited in maintaining concentration, persistence, or pace, and had suffered no extended episodes of decompensation (Tr. 199).

## C.     ALJ's Findings and Vocational Expert's Testimony

At step one, the ALJ found that Plaintiff had not engaged in gainful activity since the date of her application (Tr. 13). At step two, the ALJ found that Plaintiff suffered from three severe impairments: degenerative disc and joint disease, left shoulder status-post anterior cervical discectomy and fusion, and anxiety-related headaches with episodic syncope (*id.*). The ALJ concluded at step three, however, that none of Plaintiff's impairments were severe enough to meet or equal any listing (*id.*). The ALJ then found Plaintiff had the RFC to perform a reduced range of unskilled sedentary work, but restricted by intermittent discomfort in her cervical spine and upper extremities (Tr. 15). Although the ALJ determined Plaintiff's impairments could reasonably cause her symptoms, he found her allegations with respect to the severity of her shoulder impairment and the frequency of her headaches and blackouts to be exaggerated (Tr. 19). At step four, the ALJ found Plaintiff could not perform any of her past relevant work, all of which required light to medium exertion (Tr. 20).

To make his decision at step five, the ALJ took testimony from a vocational expert ("VE"). The VE testified that a person with Plaintiff's vocational factors and RFC could perform work existing in significant numbers, including the jobs of assembler or general production worker (Tr. 39-40). The VE also testified, however, that if Plaintiff also had to lie down for two hours every day or miss three or more days of work per month, she would be unable to maintain any competitive employment (Tr. 40-41). Based on this testimony, the ALJ determined that Plaintiff could perform

other work, and accordingly, was not disabled (Tr. 22).

## IV.    ANALYSIS

Plaintiff challenges the ALJ's decision on three grounds: first, that the ALJ failed to comply with the treating physician rule; second, that the ALJ erred in finding her testimony was not credible; and third, that the VE's testimony was based on a hypothetical question that did not include all her limitations.

### A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th

Cir. 1994).

### B.     Treating Physician Rule

Plaintiff argues the ALJ failed to follow the treating physician rule because he did not analyze or even mention the opinion of Dr. Salt, who has treated Plaintiff for nearly 13 years. The law governing the weight to be given to a treating physician's opinion is settled: A treating physician's opinion is entitled to complete deference if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)) (alteration in original). Even if the ALJ determines that the treating source's opinion is not entitled to controlling weight, the opinion is still entitled to substantial deference commensurate with "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." 20 C.F.R. § 404.1527(d)(2); Social Security Ruling ("SSR") 96-2p; *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009).

### 1.     Good Reasons Requirement

When the ALJ rejects a treating source's opinion, he "must provide 'good reasons for discounting [it], reasons sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (*quoting* SSR 96-7p). Here, Plaintiff argues, and the Commissioner concedes, the ALJ did not even mention Dr. Salt's opinion. In determining Plaintiff's RFC, the ALJ considered four of the five medical opinions in the record

and accorded them various weights (Tr. 20). The ALJ made no indication, however, that he considered Dr. Salt's opinion or, if he did consider it, what weight he gave it (Tr. 18-19).

At the outset, it is important to distinguish between Dr. Salt's treatment notes, which comprise a large part of the record, and his opinions with respect to Plaintiff's work restrictions (Tr. 498-511). The ALJ noted Dr. Salt had been treating Plaintiff since 1997 and listed the complaints Plaintiff reported to Dr. Salt around the time of her alleged onset (Tr. 18). He briefly discussed Dr. Salt's treatment notes from five of Plaintiff's ten appointments between November 2007 and December 2008 (Tr. 19), even though Dr. Salt submitted treatment notes from her alleged onset in 2006 through April 2009. Despite acknowledging Dr. Salt's extensive treatment of Plaintiff, however, at no point did the ALJ acknowledge the existence of Dr. Salt's opinions or discuss their contents, and he ultimately chose an RFC that was less restrictive than the one assigned by Dr. Salt (Tr. 15). The ALJ was cognizant of his obligation to defer to the treating source; he stated, "Social Security Regulations and SSR 96-2p provide that I must consider all opinions in evidence and to accord controlling weight to treating opinion, unless there is compelling evidence to the contrary" (Tr. 20). The ALJ did not, however, discuss any such "compelling evidence," and accordingly, I **FIND** he failed to give good reasons for rejecting Dr. Salt's opinion.

Although the Commissioner apparently concedes the error, he nonetheless argues it was harmless. As *Wilson* cautioned, a failure to give good reasons may be considered harmless only if the error is "a harmless *de minimis* procedural violation." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (*citing Wilson*, 378 F.3d at 547). A violation is harmless, for example, if the Commissioner ultimately adopts an RFC consistent with the treating physician's opinion. *See*

*Wilson*, 378 F.3d at 547.[2] A violation may also be considered *de minimis* when the treating source's opinion was "so patently deficient that the Commissioner could not possibly [have] credit[ed] it," *Wilson*, 378 F.3d at 547, or where the Commissioner "has met the goal of . . . the procedural safeguard of reasons."

### a.    "So Patently Deficient" Exception

According to the Commissioner, the ALJ's failure to give reasons for rejecting Dr. Salt's opinion is excusable because Dr. Salt's opinion was patently deficient. An opinion may be patently deficient if the treating source offers no explanation to support it. *See May v. Astrue*, 2009 WL 4716033 at *8 (S.D. Ohio 2009) (finding opinion patently deficient where source simply checked boxes about plaintiff's grasping ability and failed to provide supporting explanations or objective evidence). On the other hand, if a treating physician's opinion is consistent with the objective medical evidence, the opinion is not patently deficient. *Blakely*, 581 F.3d at 409-10. *See also Wetherington v. Astrue*, 2010 WL 897249 at *6 (E.D. Ky. 2010) (remanding because ALJ did not show how physician's opinion was inconsistent with objective evidence in record); *Davis v. Astrue*, 2010 WL 546444 at *7 (E.D. Tenn. 2010) (finding that opinion was not patently deficient because source's notes and referral of plaintiff to physical therapy were not inconsistent with his opinion). In addition, a treating physician's opinion is less likely to be patently deficient when it is based on a lengthy treating relationship. *Hall*, 148 F. App'x at 462.

By these measures, Dr. Salt's questionnaires show none of the hallmarks of a patently deficient opinion. Like the treating source opinions in *Blakely* and *Wetherington*, Dr. Salt's opinion

---

[2] As noted above, the ALJ found Plaintiff's RFC to be less restrictive than Dr. Salt's opinion, so the error cannot be considered harmless on this ground.

is consistent with the objective evidence. In his treatment of Plaintiff, Dr. Salt prescribed Imitrex to relieve her migraines and Klonopin to allay the anxiety that contributed to her tension headaches (Tr. 501). He referred Plaintiff to Dr. Jolley when an MRI revealed degenerative disc disease (Tr. 236, 334, 504, 506-08). This treatment is reflected in Dr. Salt's opinion about Plaintiff's headache-related limitations and the restrictions resulting from impairments to neck and shoulder. And like the treating physician in *Hall*, Dr. Salt treated Plaintiff over the course of many years before offering his opinion. Furthermore, unlike the opinion in *May*, in which the treating source provided few explanations for his answers to an impairment questionnaire, Dr. Salt explained his answers (Tr. 504-11). In addition to giving clarification when required by extra lines underneath the checkbox answers, Dr. Salt made handwritten remarks explaining his checked answers even when extra lines were not provided (Tr. 506, 508, 509).

The Commissioner argues Dr. Salt's opinion is patently deficient because it is internally inconsistent. Specifically, the Commissioner points out that Dr. Salt assigned restrictions based on Plaintiff's headaches and neck / shoulder impairment but also stated he had been able to "completely relieve" Plaintiff's pain without unacceptable side effects. The Commissioner's argument is defensible in the abstract; a treating physician opinion that was truly internally inconsistent might in the proper case be so patently deficient that the Commissioner would be unable to credit it. Dr. Salt's opinion, however, is not internally inconsistent. Dr. Salt's conclusion that the prescribed medications are effective to relieve Plaintiff's pain is not inconsistent with his medically-informed opinion that her impairments *or treatment* would cause her to be absent from work occasionally (Tr. 501-02, 506, 510). Nor is the absence of *medically* unacceptable side effects inconsistent with the presence of *work*-related restrictions (see Tr. 501, 506). Even if there was some ambiguity or

inconsistency in this portion of Dr. Salt's opinion, moreover, it would not be so great that the ALJ could be excused from addressing it. To approve the Commissioner's reasoning would be to conclude that the presence of a single reason for rejecting a treating physician's opinion is sufficient for rejecting it without comment. *Wilson* forbids such a conclusion. 378 F.3d at 544 (reversing the Commissioner's decision for failure to give good reasons even though substantial evidence otherwise supported the outcome). Consequently, I **CONCLUDE** Dr. Salt's opinion was not patently deficient.

### b. Procedural Safeguard Exception

In the alternative, the Commissioner argues that even assuming Dr. Salt's opinion was not patently deficient, the error was nonetheless harmless because Dr. Salt's opinion was contradicted by Plaintiff's own testimony. As the Commissioner points out, Plaintiff complained of a mental impairment and back pain, neither of which were confirmed by Dr. Salt, and headaches 3-4 times per month, instead of "daily" as reported by Dr. Salt. Tellingly, the Commissioner cites no case in which a treating physician's opinion was properly rejected, without explanation, simply because it differed from a claimant's testimony. Even assuming the Commissioner is arguing that the ALJ's decision met the goal of the good reasons rule by implicitly rejecting Dr. Salt's opinion as inconsistent with other record evidence, the argument still fails.

The goal of the good reasons rule, according to the *Wilson* court, is to ensure that a claimant is not left bewildered by an ALJ's conclusion that her doctor is wrong about her impairments. *See Wilson*, 378 F.3d at 544. An ALJ's written decision can meet this goal if it indirectly attacks the "consistency" of the treating source's opinion with other record evidence or the "supportability" of that opinion, for example, by pointing to an absence of clinical and diagnostic findings. *See Nelson*

*v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-72 (6th Cir. 2006) (acknowledging the treating sources' opinions and implicitly giving reasons for rejecting them in language preferring non-treating source opinions). It is a "rare case," however, where an ALJ's opinion will meet "the goal of the rule even if not meeting its letter." *Nelson*, 195 F. App'x at 472. It is not enough that the ALJ's decision show that he did in fact reject the treating physician's opinion; the decision must at least implicitly show *why* he rejected it. *Coldiron*, 2010 WL 3199693, at *4; *Friend v. Comm'r*, 2010 WL 1725066, at *9 (6th Cir. 2010) (unpublished); *Hall*, 148 F. App'x at 464.

Here, unlike *Nelson*, the ALJ did not even acknowledge Dr. Salt's opinion. Nor, despite the Commissioner's apparent argument, did he implicitly reveal his reasons for rejecting it. In order to implicitly reject the restrictions opined by Dr. Salt, the ALJ would have had to, at the very least, explicitly *accept* other evidence, providing a rationale for accepting the other evidence which was inapplicable to Dr. Salt's opinion. The ALJ did not accept Plaintiff's testimony, and indeed, found it to be largely incredible. Consequently, any differences between Plaintiff's testimony and Dr. Salt's opinion cannot show an implicit rejection of the latter in favor of the former.

The ALJ did explicitly adopt the less restrictive assessment of Dr. Pinga, the consultative examiner, on the basis that it was "well supported by the overall record" (Tr. 20), but even this does not operate as an implicit rejection of Dr. Salt's opinion. It would be wholly speculative to presume that, by this bare statement, the ALJ intended to say that Dr. Salt's opinion was *not* well supported by the overall record, and even more speculative to postulate what evidence the ALJ believed might have supported that conclusion. Whether or not there exist some hypothetical "good reasons" for rejecting Dr. Salt's opinion, this Court cannot affirm the Commissioner's decision on the basis of speculation. *See SEC v. Chenery*, 318 U.S. 80, 92 (1943). Simply put, it is not apparent from the

ALJ's decision that he considered Dr. Salt's opinion at all, much less why he rejected it. This is therefore not the "rare case" in which the ALJ's opinion, while failing to meet the letter of the good reasons rule, nonetheless satisfies its goal. The silence of the ALJ's decision with respect to Dr. Salt's opinion, to borrow the *Wilson* court's terminology, is bewildering. I therefore **CONCLUDE** the failure to address Dr. Salt's opinion was not harmless, and the matter must therefore be **REMANDED** to the Commissioner. In taking this step, Plaintiff is cautioned that there is no guarantee she will be awarded benefits upon further review.

### C.     ALJ's Assessment of Plaintiff's Credibility

As an alternative ground for remand, Plaintiff argues the ALJ incorrectly found her testimony was not credible (Tr. 19). Where an ALJ's credibility assessment is fully explained and not at odds with uncontradicted evidence in the record, it is entitled to great weight. *See King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984) (noting rule that ALJ's credibility assessment is entitled to "great weight," but "declin[ing] to give substantial deference to the ALJ's unexplained credibility finding"); *see also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) (holding ALJ was entitled to "rely on her own reasonable assessment of the record over the claimant's personal testimony"). The ALJ must give "specific reasons for the finding on credibility," which are "supported by the evidence on the case record." SSR 96-7p. Any inconsistencies between Plaintiff's testimony and other record evidence will lend support to an adverse credibility finding. *Rogers*, 486 F.3d at 247-48. Here, the ALJ gave three specific reasons for discrediting Plaintiff's testimony: a lack of treatment for shoulder pain, a purported exaggeration of the frequency of headaches, and daily activities not inconsistent with sedentary work.

### 1. Lack of Treatment for Left Shoulder Pain

First, the ALJ found Plaintiff's failure to pursue shoulder treatment because of an alleged lack of resources was belied by her frequent visits to Dr. Salt, at least when considered alongside Dr. Jolley's failure to refer her for further shoulder treatment (Tr. 19). Plaintiff responds that her neglect of her shoulder condition is not inconsistent with her complaints of pain, but that treatment of her headaches simply took priority. Plaintiff's contention has some merit. Courts have repeatedly observed that a claimant's failure to seek treatment may be explained by her lack of financial resources to pay for that treatment. *See*, *e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283-84 (6th Cir. 2009) (*citing Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009)); *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004); *McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990); *Blankenship v. Bowen*, 874 F.2d 116, 1124 (6th Cir. 1989). No rule of law or common sense prevents a patient from allocating her resources to the treatment of the condition she deems more serious. Dr. Salt opined that Plaintiff's shoulder pain was exacerbated by work activities (Tr. 506), and since she was not working, it is not surprising she would consider her headaches the more serious condition.

On the other hand, as the ALJ pointed out, Dr. Jolley performed surgery on Plaintiff's neck with a 95% improvement in her condition (Tr. 242). Dr. Jolley did not, however, opine that his surgery would obviate the need for future treatment. To the contrary, he specifically recommended that Plaintiff continue to see a doctor for pain "as needed" (Tr. 243). And finally, while Dr. Jolley performed surgery to correct a problem with Plaintiff's cervical spine, the record also contains evidence of a separate injury--a rotator cuff tear--to Plaintiff's shoulder (Tr.522). Standing alone, therefore, Plaintiff's failure to seek treatment for shoulder pain is not substantial evidence that her

shoulder complaints were not credible.

### 2. Frequency of Plaintiff's Headaches and Blackouts

Second, the ALJ noted that Plaintiff alleged headaches three to four times per month while Dr. Salt's treatment records showed headaches only about once per month (Tr. 19). Here, the ALJ's finding is simply wrong. As Plaintiff points out, the record shows that the frequency of Plaintiff's headaches varied over time: one to two times a month in March 2007 (Tr. 335); "a lot" in the previous month at a December 2007 visit (Tr. 319); and "most days" in February 2008 (Tr. 317). Even Dr. Salt reported Plaintiff experienced "[d]aily" stress headaches in March 2008 (Tr. 499). The Commissioner acknowledges that reports of Plaintiff's headaches were "all over the map" (Doc. 19 at 13). Furthermore, Plaintiff's pursuit of treatment and the persistence of her complaints, factors which the ALJ found weighed against her credibility with respect to her shoulder pain, weigh in her favor of her credibility regarding headaches. Plaintiff took Imitrex for migraines as ordered by Dr. Salt (Tr. 29), and she testified she focused on headache treatment to the exclusion of treatment of other impairments (Tr. 32). Consistent with that testimony, Dr. Salt noted that Plaintiff complained of headaches/migraines at numerous visits but did not specify their frequency (Tr. 321, 324, 515-19, 526-28). I **FIND** that the ALJ's finding that Dr. Salt's records show headaches happening only once per month is not supported by substantial evidence in the record.

### 3. Plaintiff's Daily Activities

Finally, citing reports that Plaintiff prepared simple meals, performed light chores, drove, and lifted about eight pounds, the ALJ found that Plaintiff's daily activities were inconsistent with her testimony about the limiting effects of her impairments (Tr. 19). A claimant's daily activities may undermine the credibility of her testimony to the extent they are inconsistent with her

testimony. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007). The supportability of the ALJ's credibility finding, then, turns on whether the record evidence of Plaintiff's daily activities is inconsistent with her testimony. The ALJ stated that Plaintiff alleged an inability to drive "contrary to findings throughout the record." Plaintiff's allegations were somewhat inconsistent; she stated in December 2006 that she did not drive because of her blackouts (Tr. 128, 131), but testified in December 2008 that she did drive, albeit infrequently, despite her blackouts (Tr. 28, 36). On the other hand, Plaintiff had just begun to experience blackouts in late 2006 (Tr. 341, 349), and as the ALJ observed, their frequency was much diminished by 2008 (Tr. 19, 518). With respect to Plaintiff's other daily activities, the ALJ points to no inconsistencies between her testimony and other record evidence. Plaintiff's description in December 2006 regarding her ability to perform chores and prepare meals, for example, was entirely consistent with her later hearing testimony (Tr. 28, 181). The ALJ opined that these activities are inconsistent with a finding that Plaintiff is unable to perform even sedentary work (Tr. 19). That may be true, but they are not inconsistent with what Plaintiff actually *said*. Consequently, they are not substantial evidence that her testimony was not credible.

Furthermore, the ALJ acknowledged during the hearing that Plaintiff had a solid work history prior to her alleged disability, lending support to her credibility (Tr. 42), but he did not discuss her work history as a factor in his credibility assessment. Nor did the ALJ discuss Dr. Salt's opinion that Plaintiff is not a malingerer (Tr. 510).[3] Without foreclosing the possibility that the ALJ may find evidence in the record to support his credibility finding, I **FIND** the brief discussion in his

---

[3] While a physician's opinion about a claimant's credibility is not binding on the ALJ, it is relevant evidence. *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009).

written decision inadequate to the task. An ALJ's credibility determination is entitled to great deference, but the ALJ cannot base that determination solely on intuition. *See Rogers*, 486 F.3d at 247-48. On remand, the ALJ should reconsider his assessment of Plaintiff's credibility in light of the foregoing. Again, Plaintiff is cautioned that she may not be awarded benefits upon further evaluation. This Court simply finds there is not enough information in the ALJ's decision and on the administrative record to rise to the level of "substantial evidence."

### D.    ALJ's Reliance on VE's Testimony

Plaintiff argues finally that the VE's testimony was based on a flawed hypothetical question. This argument essentially restates Plaintiff's primary argument--that the ALJ's RFC assessment, on which the hypothetical was based, improperly failed to take account of Dr. Salt's opinion. As such, I do not consider it separately here.

## V.    CONCLUSION

Having carefully reviewed the administrative record and the parties' pleadings, I **RECOMMEND:**[4]

> (1)    Plaintiff's motion for summary judgment [Doc. 13] seeking remand under Sentence Four of 42 U.S.C. § 405(g) be **GRANTED**.

---

[4] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

(2)     Defendant's motion for summary judgment [Doc. 18] be
        **DENIED**.

(3)     The Commissioner's decision denying benefits be
        **REVERSED** and **REMANDED** pursuant to Sentence Four
        of 42 U.S.C. § 405(g) for action consistent with this Report
        and Recommendation.


        s/*Susan K. Lee*
        _____
        SUSAN K. LEE
        UNITED STATES MAGISTRATE JUDGE